William D. CHRISTOPHER,
Petitioner-Appellant,

v.

STATE OF FLORIDA,
Respondent-Appellee.

Nos. 84–5521, 85–5220.

United States Court of Appeals,
Eleventh Circuit.

July 23, 1987.

See also, 489 So.2d 22.

Before GODBOLD, KRAVITCH and HATCHETT, Circuit Judges.

KRAVITCH, Circuit Judge:

William D. Christopher, a Florida prisoner under sentence of death, appeals the denial by the district court of his petition for habeas corpus and also the denial of his motion for relief from the judgment, filed pursuant to Rule 60(b), Fed.R.Civ.P. We hold that petitioner is entitled to habeas relief. Accordingly, we reverse.

## I. BACKGROUND

Bertha Skillin and George Ahern were shot to death in their Florida home. Christopher, who had been living in the home of the couple with his teenage daughter, Norma Sands, up through the day of the murder, was arrested September 21, 1977,[1] in Memphis, Tennessee, on a Florida warrant. Norma, and Christopher's half-brother and half-sister, Pete and Pam Scott, were with Christopher at the time of his arrest and also were taken into custody.[2]

The following evening, two Florida police officers, Lieutenant Mills and Officer Young, accompanied by several Memphis officers, began interrogating Christopher. Initially Christopher denied killing the couple, claiming that Ahern had killed Skillin and then had committed suicide. Christopher said that he had found the couple dead on the day of the murder and had fled because he had a criminal record and Ahern had used Christopher's gun, a gun Christopher said he had sold to Ahern. Subsequently, after at least two hours of questioning and, according to Christopher, several violations of his right to cut off questioning, Christopher confessed to both murders. The initial confession was not recorded; immediately afterwards the tape recorder was turned back on and Christopher repeated his confession. This confes-

Joseph L. Daye, William H. Lefkowitz, John H. Pelzer, Thomas R. Bolf, Fort Lauderdale, Fla., for petitioner-appellant.

William E. Taylor, Katherine V. Blanco, Asst. Attys. Gen., Tampa, Fla., for respondent-appellee.

---

1. Although the district court stated that Christopher was arrested September 22, 1977, the record indicates otherwise. This date is not relevant to our holding, however.

2. The factual background of this case is contained in the district court's opinion. *Christopher v. State of Florida,* 582 F.Supp. 633, 635–36 (S.D.Fla.1984). The district court's findings regarding the facts of the murders apparently is based on Christopher's confession, as there is no independent evidence in the record to support these findings.

sion was later played to the jury over Christopher's objection.

The State of Florida tried petitioner twice for the murders of Skillin and Ahern. The first trial, in May 1978, resulted in a hung jury and a mistrial. Following a change of venue, Christopher was retried in August, 1978. On August 18, 1978, Christopher was convicted by a jury of two counts of first degree murder. He was sentenced to death, as recommended by the jury.[3]

The Florida Supreme Court affirmed the convictions and sentence on direct appeal. *Christopher v. State*, 407 So.2d 198 (Fla. 1981), *cert. denied*, 456 U.S. 910, 102 S.Ct. 1761, 72 L.Ed.2d 169 (1982). Subsequently, on appeal from the denial of a 3.850 motion for post-conviction relief and on a petition for writ of error *coram nobis*, the Florida court again upheld the convictions and the sentence. *Christopher v. State*, 416 So.2d 450 (Fla.1982).

Christopher, raising eleven claims,[4] petitioned the federal district court for a writ of habeas corpus, as well as for a stay of execution. The district court granted the stay on June 23, 1982; on March 13, 1984, the court denied habeas relief without an evidentiary hearing.[5] *Christopher v. State*, 582 F.Supp. 633 (S.D.Fla.1984). Christopher appealed.

The petitioner subsequently filed with the district court a motion for relief from judgment pursuant to Rule 60(b), Fed.R. Civ.P., alleging that he did not testify at the hearing regarding suppression of the confession because the trial court refused to rule on the admissibility at trial of such testimony and his trial counsel did not know the law on this issue. The district court denied this motion.[6]

Petitioner appealed and this court granted his motion for a consolidation.[7]

---

3. The trial judge sentenced petitioner to death after finding that there were two aggravating circumstances: (1) petitioner previously had been convicted of violent felonies, and (2) the murders were "heinous, atrocious or cruel," and that there were "no" mitigating circumstances.

4. Christopher raised the following claims in district court: (1) that the evidence was insufficient to support (a) the finding of aggravation that Christopher had prior convictions for attempted rape and assault to commit murder, (b) the finding of aggravation that the two murders were heinous, atrocious or cruel and (c) the finding that the aggravating circumstances outweighed the mitigating ones; (2) that he was denied his right to a jury composed of a representative cross-section of the community by the exclusion of two jurors who voiced only general objections to the death penalty; (3) that the confession was inadmissible since (a) it was unlawfully obtained in violation of Christopher's right to cut off questioning and (b) it was coerced; (4) that the admission of irrelevant and highly prejudicial evidence on Christopher's incestuous relationship with his daughter Norma denied him his right to a fair trial; (5) that the trial court's refusal to require the State to pay the cost of a sodium pentothal test and its grant of the prosecutor's motion to preclude the admission of polygraph test results allegedly favorable to Christopher denied Christopher his right to a fair trial; (6) that the trial court erred in failing to provide a psychiatric examination since petitioner's competency to assist at trial and sanity at the time of the murders was in issue; (7) that the Florida death penalty statute

is unconstitutional; (8) that he was denied due process as a result of the Florida Supreme Court's receipt of *ex parte* information concerning Christopher during direct appeal; (9) that the State improperly suppressed exculpatory evidence, in particular a tape recording of Norma which indicates that she had a motive to kill the couple; (10) that he has a right to a new trial given the newly discovered evidence that Norma confessed to petitioner's mother that she, Norma, had shot the couple; and (11) that his trial lawyer was ineffective.

5. The district court denied Christopher both a certificate of probable cause (CPC) and leave to appeal *in forma pauperis* (IFP). This court granted both CPC and IFP by order dated December 27, 1984.

6. The district court denied petitioner both CPC and IFP. This court granted both CPC and IFP by order dated August 21, 1985.

7. In this consolidated appeal, petitioner challenges the district court's denial of the Rule 60(b) motion. He also contests the district court's denial of habeas relief on seven different grounds: (1) the confession was inadmissible because (a) it was obtained in violation of his right to cut off questioning and (b) it was coerced; (2) two jurors were improperly excluded; (3) the "heinous, atrocious, or cruel" aggravating circumstance was improperly applied in this case; (4) the prior conviction aggravating circumstance was improperly applied; (5) the trial court unlawfully used a non-statutory aggravating circumstance; (6) the trial court's

## II. ADMISSIBILITY OF THE CONFESSION

Christopher claims that his confession should not have been admitted into evidence because it was obtained in violation of his right to remain silent, and thus was inadmissible under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[8] The district court denied this claim, apparently on the ground that Christopher had not invoked his right to remain silent because he not only failed to clearly assert the right but thereafter continued to speak.[9] *Christopher,* 582 F.Supp. at 643–44. For the reasons set forth below, we reverse.

### A.

In *Miranda v. Arizona* the Supreme Court established procedural safeguards to protect the constitutional rights of persons subject to custodial interrogation. The *Miranda* Court held that unless law enforcement officers give certain specified warnings prior to questioning a person in custody,[10] and follow certain specified procedures during the course of any subsequent interrogation, the state may not use in its case in chief any statement by the suspect, over the suspect's objection. 384 U.S. at 476–79, 86 S.Ct. at 1629–30; *accord Oregon v. Elstad,* 470 U.S. 298, 317, 105 S.Ct. 1285, 1298, 84 L.Ed.2d 222 (1985); *Michi-*

*gan v. Mosley,* 423 U.S. 96, 99–100, 96 S.Ct. 321, 324–25, 46 L.Ed.2d 313 (1975).

Among the procedural safeguards established by the *Miranda* Court is the "right to cut off questioning." *Miranda,* 384 U.S. at 474, 86 S.Ct. at 1628. This right, established as a "critical safeguard" of the Fifth Amendment right to remain silent, *Mosley,* 423 U.S. at 103, 96 S.Ct. at 326, requires the police to immediately cease interrogating a suspect once the suspect "indicates *in any manner,* at any time . . . during questioning, that he wishes to remain silent."[11] *Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627–28 (emphasis added); *Mosley,* 423 U.S. at 100, 96 S.Ct. at 325; *see Martin v. Wainwright,* 770 F.2d 918, 923–24 (11th Cir.1985), *modified,* 781 F.2d 185, *cert. denied,* — U.S. —, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986).

Although established in *Miranda,* it was in *Mosley, supra,* that the Court delineated the scope of "the right to cut off questioning." Reiterating that this right serves as an essential check on "the coercive pressures of the custodial setting" by enabling the suspect to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation," 423 U.S. at 103–04, 96 S.Ct. at 326, the *Mosley* Court reaffirmed *Miranda*'s requirement that "the interrogation must cease" when the person in custody "indicates in any

---

finding that there were "no" mitigating circumstances is not supported by the record; and (7) the district court improperly denied an evidentiary hearing on petitioner's ineffective assistance of counsel claim.

**8.** Christopher also alleges that the confession was coerced and thus was inadmissible. *See* note 7, *supra.* Given that we hold that the confession was inadmissible because it was obtained in violation of Christopher's *Miranda* rights, we need not, and therefore do not, reach the voluntariness issue. We do observe, however, that the district court incorrectly treated the voluntariness determination as a finding of fact and thus accorded deference to the state court finding under 28 U.S.C. § 2254(d). 582 F.Supp. at 643. Although the state court's findings of historical fact must be accorded a presumption of correctness, voluntariness is a question of law and requires independent federal determination. *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985).

**9.** On direct appeal, the state court incorrectly treated the right to cut off questioning claim as if it were a voluntariness claim. The court did not even mention *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in that portion of the opinion. *Christopher v. State,* 407 So.2d 198, 200–01 (Fla.1981).

**10.** The warnings must inform the person in custody "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612.

**11.** The *Miranda* Court also established procedural safeguards to protect the right to consult with counsel. *Miranda,* 384 U.S. at 474–75, 86 S.Ct. at 1628. The present case, however, does not involve the procedures to be followed if the person in custody requests counsel since Christopher never made such a request.

manner" that he wishes to remain silent. 423 U.S. at 101–02, 96 S.Ct. at 325–26. This requirement was incorporated into the Court's holding that statements taken after a suspect indicates his desire to remain silent are inadmissible [12] unless the suspect's " 'right to cut off questioning' was 'scrupulously honored.' " *See Mosley,* 423 U.S. at 101, 103–04, 96 S.Ct. at 325–26; *United States v. Bosby,* 675 F.2d 1174, 1182 (11th Cir.1982) ("where a defendant asserts his right to remain silent ... law enforcement officers are required to cease questioning [him.]").

### B.

The determination of whether a suspect's right to cut off questioning was scrupulously honored requires a case-by-case analysis. *United States v. Hernandez,* 574 F.2d 1362, 1369 (5th Cir.1978).[13] Applying the principles of *Miranda* and *Mosley* to the facts of this case, we conclude that here, in sharp contrast to *Mosley,* the police did not "scrupulously honor" petitioner's right to terminate the interrogation.

In *Mosley* the Supreme Court found that the suspect's right to cut off questioning was "scrupulously honored" because "the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." 423 U.S. at 106, 96 S.Ct. at 327.

As is apparent from the following transcript of the confession, in the instant case the petitioner's rights were accorded no such respect:

> CHRISTOPHER: *Then I got nothing else to say. If you're accusing me of murder, then take me down there.*

MILLS: You were accused when you came in here. You knew you were accused—

CHRISTOPHER: That's right. That's right.

MILLS: —you knew what you were accused of, and I told you what [your daughter] was accused of, so don't make out like you don't know what you're accused of.

CHRISTOPHER: Oh, ah,—I know what I'm accused of. I know that I'm accused of both murders.

MILLS: I told you awhile ago you were being charged with both murders.

CHRISTOPHER: Okay then. *I got nothing else to say.*

YOUNG: You mean it's all right as long as we accuse you of one?

MILLS: But all of a sudden when you're accused of two, you don't—

CHRISTOPHER: I'm not saying that, I know that, didn't I tell you awhile ago that I knew that ya, I was accused of both murders?

YOUNG: Yeah. You—you should know.

CHRISTOPHER: Okay then. *What's the need of me saying anything then.*

MILLS: What are you upset about?

CHRISTOPHER: You ask me? I'm upset about the fact that you're bringing my daughter up here, like I'm using her in this thing.

YOUNG: I'm asking you—

MILLS: I'm asking you to explain her actions in this thing? ...

(Emphasis added).

■ Here the interrogation did not cease immediately after Christopher first indicated that he wished to remain silent, and, in fact, continued despite Christopher's repeated invocations of his right of silence. Moreover, the police continued to interrogate Christopher on the very crimes that

---

**12.** We are concerned here only with the use of an allegedly unlawful confession in the prosecution's case in chief. *Cf. Harris v. New York,* 401 U.S. 222, 225–26, 91 S.Ct. 643, 645–46, 28 L.Ed.2d 1 (1971) (a voluntary but unlawfully-obtained statement may be admitted by the prosecution to impeach the defendant on cross-examination).

**13.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

were the subject of the interrogation when Christopher invoked his right to silence. Accordingly, there can be no doubt that the officers violated Christopher's right to cut off questioning; therefore, all statements taken during the unlawfully continued interrogation were inadmissible. *See Martin,* 770 F.2d at 923–24; *United States v. Poole,* 794 F.2d 462, 466–67 (9th Cir.1986); *Anderson v. Smith,* 751 F.2d 96, 105 (2d Cir.1984); *see Hernandez,* 574 F.2d at 1369–70; *cf. Mosley,* 423 U.S. at 105–06, 96 S.Ct. at 327 (interrogation immediately ceased, reinitiated on *different subject* more than two hours later, after warnings were readministered); *Bosby,* 675 F.2d at 1182 (interrogation immediately ceased, reinitiated two weeks later, after warnings were readministered).

### C.

The State contests this conclusion and argues that we should affirm the district court's determination that Christopher did not adequately assert this right because he "voluntarily continued the interrogation." 582 F.Supp. at 644.

The State cannot prevail on this argument, however. Contrary to the district court's holding, a suspect's claim that the police violated his right to silence by failing to immediately terminate the interrogation is not negated by the fact that the suspect answered additional questions after the police failed to scrupulously honor his request to end the questioning. *See Martin,* 770 F.2d at 923–24; *Hernandez,* 574 F.2d at 1369. "[A]n accused's *post-request* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith v. Illinois,* 469 U.S. 91, 98, 105 S.Ct. 490, 495, 83 L.Ed.2d 488 (1984) (emphasis in original). The fact that Christopher contin-

ued to speak, therefore, has no bearing on his claim that he invoked, and the police immediately failed to honor, his right to remain silent.

### D.

The State also argues that Christopher's rights were not violated because his first attempt to assert his right to cut off questioning was equivocal[14] and the subsequent conversation between Christopher and the officers was "nothing more than an attempt by a police officer to make a clarification." The State, moreover, claims that after this clarification Christopher continued to speak of his own volition.[15]

We note at the outset that the State mischaracterizes the issue. Contrary to the argument asserted by the State, a suspect need not "clearly ask[ ] that the interrogation stop," Appellee's Brief at 15, in order to invoke his right to remain silent. Rather, *Miranda* and its progeny require the police to terminate the interrogation if the suspect "indicates, in any manner, at any time ... during questioning that he wishes to remain silent." *Mosley,* 423 U.S. at 100–01, 96 S.Ct. at 325, *quoting, Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627. Thus, an equivocal indication of a desire to remain silent, like an unequivocal indication, suffices to invoke *Miranda*'s requirement that the interrogation cease. *Martin,* 770 F.2d at 924; *Anderson,* 751 F.2d at 103; *United States v. Lopez-Diaz,* 630 F.2d 661, 664–65 (9th Cir.1980). Accordingly, we need not determine whether Christopher's first indication that he wished to remain silent was equivocal because, even if it were, the officers violated *Miranda* by failing to terminate the interrogation.

■ As the State observes, following an equivocal indication of the desire to remain

---

**14.** In particular, the State claims that Christopher's first statement, "[t]hen I got nothing else to say" was not a clear invocation of the right to cut off questioning because it was rendered conditional by his statement *"[i]f you're accusing me of murder, then take me down there."* (Emphasis added).

**15.** The State's account of the interrogation in its brief varies substantially from the record. The

State claims that after Officer Mills' initial "clarifying" statements "Christopher continue[d] of his *own volition* to speak." Appellee's Brief at 15 (emphasis supplied). While the State concedes that there were other attempts to terminate the interrogation, the State does not mention that Christopher responded to this purported clarification with a second request to cut off questioning.

silent, officers may ask questions designed to clarify whether the suspect intended to invoke his right to remain silent.[16] *Martin*, 770 F.2d at 924; *Anderson*, 751 F.2d at 103; *see Lopez-Diaz*, 630 F.2d at 665. The rule, however, permits "clarification," not questions that, though clothed in the guise of "clarification," are designed to, or operate to,[17] delay, confuse, or burden the suspect in his assertion of his rights. Because such questions serve to keep the suspect talking, not to uphold his right to remain silent, they constitute unlawful "interrogation," not permissible clarification. *See Mosley*, 423 U.S. at 105–06, 96 S.Ct. at 327 (following an invocation of the right to silence the investigators may not attempt to wear down the suspect's resistance and make him change his mind); *Martin*, 770 F.2d at 924 (further questioning must be limited to clarifying the equivocal request); *Anderson*, 751 F.2d at 103, 105 (inquiry as to why suspect wishes to remain silent is impermissible interrogation, not lawful clarification); *Lopez-Diaz*, 630 F.2d at 665; *see also United States v. Johnson*, 812 F.2d 1329, 1331 (11th Cir.1986) (following an invocation of right to counsel the police may not even implicitly indicate to the suspect that cooperating with the police would be beneficial to him); *Nash v. Estelle*, 597 F.2d 513, 517–18 (5th Cir.) (en banc) (the interrogator may not attempt to persuade the suspect to retract a previously-voiced request for counsel), *cert. denied*, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979).

Employing these principles, we conclude that the officers' response to Christopher's purported equivocal invocations of his right to remain silent constituted an unlawful continuation of the interrogation, and not permissible interrogation. After Christopher's initial assertion of his right to remain silent, the officers, if they considered the assertion equivocal, legitimately might have asked a simple question to clarify whether Christopher wanted to stop talking. Instead, Officer Mills responded by challenging Christopher: "You were accused when you came in here.... [Y]ou knew what you were accused of, and I told you what [your daughter] was accused of, so don't make out like you don't know what you're accused of." This statement did not clarify whether Christopher wished to remain silent. Instead, in violation of *Miranda*, it challenged the basis of Christopher's decision to remain silent. *See Anderson*, 751 F.2d at 105. In addition, the response could have reinforced Christopher's previous concerns that his daughter might be implicated in the murders, impermissibly indicating that Christopher should reconsider his decision not to talk and instead should help his daughter by confessing to the murders. *See Johnson*, 812 F.2d at 1331 (after a request for counsel the interrogation must cease; the police may not indicate to suspect that it is in his interest to cooperate with them); *cf. Mosley*, 423 U.S. at 104, 96 S.Ct. at 327 (police behavior condoned where, after request to stop questioning, the police did not try "in any way to persuade [the suspect] to reconsider his position.").

Furthermore, Christopher responded to the officers' statements by again indicating his desire to remain silent: "Okay then. I got nothing else to say." This comment, considered in the totality of the circumstances, cannot be viewed as anything other than an unequivocal invocation of his right to remain silent. *Poole*, 794 F.2d at 466 (interrogation should have ceased after suspect said he has "nothing to talk about").[18] Therefore, no further "clarifica-

---

**16.** [T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.
*Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980) (footnotes omitted).

**17.** The determination of whether questioning constituted interrogation, as opposed to clarification, "focuses primarily upon the perceptions of the suspect." *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689.

**18.** *See People v. Carey*, 227 Cal.Rptr. 813, 814–15, 183 Cal.App.3d 99 (2d Dist.1986) (suspect's statement "I ain't got nothing to say" was an unequivocal invocation of right to silence), *cert.*

tion" was either necessary or permissible; yet even then the officers did not terminate the interrogation. This continued questioning of Christopher was in violation of his *Miranda* rights.[19] *Martin,* 770 F.2d at 924 (where request is equivocal further questioning must be limited to clarifying the request; once it is clarified questioning must cease); *Anderson,* 751 F.2d at 103 (police may "clarify" only where the request to cut off questioning was equivocal); *see Smith v. Illinois,* 469 U.S. at 98, 105 S.Ct. at 494 ("Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, *all questioning must cease.*") (emphasis added).

### E.

The State argues that, even if the officers did not scrupulously honor Christopher's right to cut off questioning, the confession nevertheless is admissible because Christopher "initiated" the continued questioning when, during the discussion of extradition, Christopher said, "Can I ask one question? " [20]

*denied, sub nom., California v. Carey,* —— U.S. ——, 107 S.Ct. 1297, 94 L.Ed.2d 153 (1987).

**19.** Furthermore, even had we concluded that this second attempt to invoke his right to silence also was equivocal, we still would find that the officers violated Christopher's *Miranda* rights because, as can be seen from the quoted portion of the interrogation, the officers did not respond to this request by attempting to clarify Christopher's intent. Instead, they responded by challenging Christopher in an attempt to keep him speaking, despite his previous assertion of his right to silence. Accordingly, whether or not Christopher's second request was equivocal, the officers' response was unlawful under *Miranda. See Martin v. Wainwright,* 770 F.2d 918, 924 (11th Cir.1985), *modified,* 781 F.2d 185, *cert. denied,* —— U.S. ——, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986); *Anderson v. Smith,* 751 F.2d 96, 105 (2d Cir.1984).

Moreover, immediately after this second request to stop, and second unlawful continuation of the interrogation, Christopher made a third, albeit somewhat equivocal, request to stop ("Okay then. What's the need of me saying anything then."). Once again the officers improperly failed to terminate the interrogation. Instead, Mills asked Christopher: "What are you upset about?" Given the previous requests to stop, at this point there certainly was no need for clarification. Moreover, Mills' question was not a "clarification." Rather, it was interrogation because it invited a response from Christopher that was not restricted to the issue of whether Christopher wished to terminate the interrogation. Mills' response thus constituted yet another violation of Christopher's *Miranda* rights. *See United States v. Poole,* 794 F.2d 462, 467 (9th Cir.1986) (the interrogating officer's questions as to suspect's name, date of birth and place of birth following suspect's assertion of his right to silence constituted impermissible interrogation); *Anderson,* 751 F.2d at 105 (asking a suspect why he wishes to remain silent following an invocation of the right to silence is unlawful interrogation, not permissible "clarification"); *see also United States v. Johnson,* 812 F.2d 1329, 1331 (11th Cir.1986) (officer's inquiry

following request for counsel: "Do you want to know what will happen to you," "related directly or indirectly to the investigation" and thus constituted unlawful interrogation); *cf. Michigan v. Mosley,* 423 U.S. 96, 104–05, 96 S.Ct. 321, 327, 46 L.Ed.2d 313 (1975) (police "scrupulously honored" the suspect's right to cut off questioning where they "immediately ceased the interrogation and did not try either to resume the questioning or in any way to persuade [the suspect] to reconsider his position"); *Bradshaw,* 462 U.S. at 1045–46, 103 S.Ct. at 2835 (subsequent questioning following invocation of right to counsel was permissible where the police stopped interrogation after defendant requested counsel).

**20.** The relevant portion of the transcript reads as follows:

CHRISTOPHER: Well, look, I'm just constantly telling lies, *look I ain't got nothing to say at all,* Pete, why I have, you know, and that's it. *I ain't saying nothing else.*
MILLS: Okay.
CHRISTOPHER: *That I'm charged with two murders,* ---, is all I can say.
MILLS: Okay. This brings us up to another point, which has nothing to do with what we're talking about. Ah, we're here from Florida and these warrants, these warrants are from Florida. Which you know you have to be extradited down there. That can come about several different ways, you can sign on whether you want --- here. Ah, would you sign a waiver and go back?
CHRISTOPHER: When are you all taking me back if I sign a waiver? ... [short exchange on when taking him back if he signs].
CHRISTOPHER: Right. If I don't sign, how long have I got before you all take me back?
MILLS: Well, we'll go ahead and initiate the ah, the proceedings, and ah, everhow they progress, well, as soon as the proceedings are over, then, we're going back down.
YOUNG: I can't say how long it will be, it might take a week, I don't know.
BOSWELL: It's usually 30 to 60 days.
MILLS: Is that right?

The origins of the initiation doctrine lie in the *Miranda* Court's ruling that *Miranda*'s procedural safeguards apply only to "custodial interrogation" of a suspect: defined as "questioning *initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612 (emphasis added). Based on this limitation, the Court in subsequent right to counsel cases has held that *Miranda*'s *per se* bar against "interrogation" following a request for counsel does not prohibit the police from taking statements during a *suspect-initiated* conversation because suspect-initiated conversation is not "interrogation." *Edwards v. Arizona*, 451 U.S. 477, 485–86, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); *see Oregon v. Bradshaw*, 462 U.S. 1039, 1044–45, 103 S.Ct. 2830, 2834–35, 77 L.Ed.2d 405 (1983).

While we recognize that *Edwards* and *Bradshaw* are right to counsel cases, and that *Mosley* governs the admissibility of statements made following the suspect's invocation of his right to cut off questioning, *Mosley*, 423 U.S. at 104, 96 S.Ct. at 326, we accept the State's implicit claim that there are situations where the "initiation" test of *Edwards/Bradshaw* governs the admissibility of statements made after a suspect has invoked his right to terminate questioning. *See Smith v. Wainwright*, 777 F.2d 609, 618 (11th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986). Although right to counsel and right to silence cases are distinguishable because the right to silence is not protected by a *per se* rule, *compare Mosley*, 423 U.S. at 101–04 & n. 10, 96 S.Ct. at 325–26 & n. 10, *with Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85, the two types of cases can be similar because the invocation of the right to silence does raise

a *per se* bar to further interrogation in certain circumstances. At the very least a suspect's request to cut off questioning serves as a complete bar to any questioning related to the subject of the initial interrogation for a "significant period of time" after the request. *Hernandez*, 574 F.2d at 1369 (police must wait a "significant period of time" before resuming questioning); *see Mosley*, 423 U.S. at 102, 96 S.Ct. at 325–26 (*Miranda* prohibits "the immediate cessation of questioning, and . . . a resumption of interrogation after a momentary respite."). Thus, for a "significant period" following a request to cut off questioning, the suspect stands in virtually the same position as he would be had he requested counsel: the police are barred from interrogating him. *Hernandez*, 574 F.2d at 1369.

 Non-interrogatory conversation may occur during this "significant period," however. We conclude therefore that during this "significant period" the *Edwards/Bradshaw* rule merges with the test of *Mosley* to render inadmissible statements obtained during a "significant period" after a request to cut off questioning, unless the statements were the product of a conversation initiated by the suspect under the test of *Edwards/Bradshaw*. *See Smith v. Wainwright*, 777 F.2d at 618. We further conclude that both prongs of the *Edwards/Bradshaw* rule apply: where the "initiated" conversation is not "wholly one-sided," but instead involves interrogation by the police, the suspect's statements are admissible only if the suspect both initiated the dialogue *and* waived his previously-asserted right to silence. *Smith v. Wainwright*, 777 F.2d at 618; *see Connecticut v. Barrett*, —— U.S. ——, 107 S.Ct. 828, 831, 93 L.Ed.2d 920 (1987); *Bradshaw*, 462 U.S. at 1044–45, 103 S.Ct. at 2834; [21]

CHRISTOPHER: *Can I ask one question?*
MILLS: Sure. ...
(emphasis added).

Christopher then requested the officers to turn off the tape recorder and asked about what was going to happen to his daughter Norma. According to the officers' testimony at trial, after this discussion of Christopher's daughter the officers changed the topic of conversation

back to the subject of Christopher's involvement in the murders.

**21.** Although Justice Rehnquist's opinion in *Bradshaw* is a plurality opinion, joined by only three other justices, the four justices in the dissent agreed with the plurality that in order for statements following a request for counsel to be admissible, the state must show that the suspect "initiated" further conversation with the police

*Edwards,* 451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n. 9.

Although the "initiation" doctrine of *Edwards/Bradshaw* does apply to some right to silence cases, it does not affect the outcome in the instant case. The first prong of the initiation test requires that it was the suspect, not the police, who "initiated," or "reopened," the dialogue. *Bradshaw,* 462 U.S. at 1044–45, 103 S.Ct. at 2834. "Initiation" means to "begin" or "set-going"; in the interrogation context, it means that the suspect "started," not simply "continued," the interrogation. Therefore, the first prong of the initiation test requires that any previous police-initiated interrogation have ended *prior* to the suspect's alleged initiatory remark; for, just as one cannot start an engine that is already running, a suspect cannot "initiate" an on-going interrogation.[22] *See Smith v. Wainwright,* 777 F.2d at 618 ("*If* [the suspect's] request that questioning cease was honored, ... the question *then* becomes who initiated the subsequent interrogation.") (emphasis added); *cf. Bradshaw,* 462 U.S. at 1041–42, 103 S.Ct. at 2833 (initial interrogation had clearly ended before the suspect "initiated" a conversation with the police).

■ In the instant case, minutes before the alleged "initiation," Christopher again invoked his right to cut off questioning. Rather than honor this right and terminate the interrogation, Officer Mills "switched the subject" to whether Christopher would agree to be extradited to Florida on the murder charges. The State argues that this change of subject was a sufficient

honoring of Christopher's rights to permit the conclusion that Christopher's question was an "initiation." *Mosley,* however, requires more than a switch of subject after an invocation of the right to silence; rather, *Mosley* requires the termination of the interrogation. *See Martin,* 770 F.2d at 924; *Anderson* 751 F.2d at 103.

Although the police may terminate an interrogation without falling into total silence, any discussion with the suspect other than that "relating to routine incidents of the custodial relationship" must be considered a continuation of the interrogation. *See Bradshaw,* 462 U.S. at 1045, 103 S.Ct. at 2835. Specifically, the police may make routine inquiries of a suspect after he requests that they terminate questioning, such as whether he would like a drink of water. *See id.* They may not ask questions or make statements which "open up a more generalized discussion relating directly or indirectly to the investigation," as this constitutes interrogation. *Id.; Johnson,* 812 F.2d at 1331; *see Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980).

Because here the officers' inquiries regarding Christopher's extradition "relate[d] directly or indirectly to the investigation," these questions were an unlawful continuation of the interrogation. *Johnson,* 812 F.2d at 1331; *see Poole,* 794 F.2d at 467 (agent's questions as to suspect's name, and date of birth following a request to cut off questioning constituted impermissible

and that the suspect validly waived his previously asserted right to counsel and right to silence under the standard announced in *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Where the dissent split from the plurality was the definition of "initiation." *Bradshaw,* 462 U.S. at 1051, 1053–54 & n. 2, 103 S.Ct. at 2838, 2839–40 & n. 2 (Marshall, J. dissenting). Although the plurality said that to "initiate" a conversation the question that "reopens" the dialogue need only "evince[ ] a willingness and a desire for a generalized discussion about the investigation," 462 U.S. at 1045–46, 103 S.Ct. at 2835, the dissent stated that the initiatory "inquiry must demonstrate a desire to discuss *the subject matter of the criminal investigation.*" 462 U.S. at 1055, 103 S.Ct. at 2840 (emphasis added).

**22.** This holding not only is consistent with, it is necessitated by, *Mosley.* For, as the Court stated in *Mosley,* the underlying purpose of the right to cut off questioning is to give the suspect control over "the time at which questioning occurs, the subjects discussed, and the duration of the interrogation," so as to "counteract[ ] the coercive pressures of the custodial setting." *Mosley,* 423 U.S. at 103–04, 96 S.Ct. at 326. Allowing a suspect to control the timing of an interrogation through his ability to "initiate" it serves this purpose; permitting the police to continue a custodial interrogation despite a request to stop in the hope that the suspect will eventually ask a question does not. *See id.* at 102–03, 96 S.Ct. at 325–26.

846

interrogation); *United States v. Webb*, 755 F.2d 382, 389 (5th Cir.1985) (officer's inquiry as to what kind of trouble the suspect was in constituted unlawful interrogation). Accordingly, we conclude that, because the initial police-initiated interrogation was still in progress when Christopher asked the question at issue, this question was not an "initiation;" rather, it was merely a question posed during the course of an on-going police-initiated interrogation. Therefore, given that an unlawfully-continued police-initiated interrogation is not rendered lawful simply because a suspect asked a question, we reject the State's argument and hold the confession inadmissible.

### III. HARMLESS ERROR

At oral argument, for the first time, the State suggested that the admission of Christopher's confession was at worst harmless error.

The appropriate standard for determining whether this error was harmless is set forth in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).[23] *Martin*, 770 F.2d at 932–33; *Hernandez*, 574 F.2d at 1372. In order for an error to be deemed "harmless" under *Chapman* the state must prove beyond a reasonable doubt that the admission of the confession did not contribute to the verdict obtained. *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828; *Martin*, 770 F.2d at 932 n. 23. The state must show that the evidence that remains after the unlawful confession is excluded not only is sufficient to support the verdict, but overwhelmingly establishes

the defendant's guilt beyond a reasonable doubt. *Harryman v. Estelle*, 616 F.2d 870, 876 (5th Cir.) (en banc), *cert. denied*, 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980); *see Brown v. United States*, 411 U.S. 223, 230–32, 93 S.Ct. 1565, 1569–70, 36 L.Ed.2d 208 (1973); *Milton v. Wainwright*, 407 U.S. 371, 372–73, 377–78, 92 S.Ct. 2174, 2175–76, 2178, 33 L.Ed.2d 1 (1972).

Because confessions carry "extreme probative weight," *Hernandez*, 574 F.2d at 1372, the admission of an unlawfully obtained confession rarely is "harmless error." In fact, we have ruled the admission of an unlawful confession harmless only in limited instances, such as where there was in evidence at least one other lawful confession by the defendant.[24] *Compare Martin*, 770 F.2d 932–33 & n. 24 (harmless error where a lawful confession was admitted at trial) *and United States v. Davidson*, 768 F.2d 1266, 1271–72 (11th Cir.1985) (same) *with Hernandez*, 574 F.2d at 1372 & n. 22 (admission of confession not harmless despite defendant's presence at scene of major marijuana unloading operation because there was insufficient direct evidence connecting the defendant to the truck or its contents) *and United States v. Blair*, 470 F.2d 331, 338 (5th Cir.1972) (admission statement not harmless where it "provided the Government with a key link in the evidentiary chain of proof"), *cert. denied*, 411 U.S. 908, 93 S.Ct. 1536, 36 L.Ed.2d 197 (1973); *accord Milton v. Wainwright*, 407 U.S. at 372–73, 92 S.Ct. at 2174–75 (alleged involuntary confession to police officer posing as cell mate would be harmless in light

**23.** Although the admission of a coerced confession is never harmless error, *Rose v. Clark*, —— U.S. ——, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986), *citing, Chapman v. California*, 386 U.S. 18, 23 n. 8, 87 S.Ct. 824, 828 n. 8, 17 L.Ed.2d 705 (1967), an otherwise unlawful but voluntary confession can be harmless error, *Martin*, 770 F.2d at 932–33. Because we conclude that the admission of Christopher's unlawful confession was not harmless error, we need not address the voluntariness issue.

**24.** Those cases in which we have ruled that the admission of an unlawful confession was harmless even where it was the only confession admitted generally have been cases in which, unlike this case, there was *direct*, uncontradicted,

physical evidence of guilt—such as that the defendant was found holding the drugs he was charged with possessing. *E.g. Harryman v. Estelle*, 616 F.2d 870, 876–78 & n. 15 (5th Cir.) (en banc), *cert. denied*, 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980) (unlawful confession that contents of condom found on defendant's person was heroin was harmless in light of laboratory tests identifying the substance to be heroin); *United States v. Hill*, 430 F.2d 129, 132 (5th Cir.1970) (defendant's statement to customs agent that truck contained liquor was harmless where state introduced evidence obtained during lawful search of the truck demonstrating that the truck did contain liquor).

of three previous valid confessions); *Poole,* 794 F.2d at 467–68 (admission statements not harmless despite eyewitness testimony that defendant robbed the bank); *but cf. Felder v. McCotter,* 765 F.2d 1245, 1250–51 (5th Cir.1985) (use of unlawful confession not harmless even though there was a second, less detailed, admission in evidence), *cert. denied,* —— U.S. ——, 106 S.Ct. 1523, 89 L.Ed.2d 921 (1986).

We conclude that here the admission of the unlawful confession was not "harmless error." The unlawful confession was the only confession admitted at trial and it was heavily relied upon by the prosecution. There were no eyewitnesses to the murders. Moreover, the physical evidence introduced (blood on Christopher's shoes, fingerprints in the house, Christopher's gun), as well as both the evidence of Christopher's incestuous relationship with Norma and Norma's testimony, were not inconsistent with petitioner's original murder-suicide alibi. Furthermore, Heinrich Schmid, the Collier County medical examiner, testified only that he "[did] not believe" that Ahern's wounds were self-inflicted.[25] A reasonable jury could have concluded, based on the lawfully introduced evidence, that the State had not established petitioner's guilt beyond a reasonable doubt. This conclusion is buttressed by the fact that Christopher's first trial resulted in a hung jury. We find, therefore, that the erroneous admission of the unlawful confession was not harmless error.

Accordingly, we REVERSE and REMAND to the district court with directions to grant the writ of habeas corpus with respect to both convictions, conditioned upon the State's affording Christopher a new trial.[26]

---

**25.** Furthermore, the erroneous admission of the confession certainly affected the conduct of Christopher's defense. *See Harryman,* 616 F.2d at 877 n. 15.

**26.** Because we conclude that the confession was inadmissible and therefore a new trial is neces-

sary, we need not, and therefore do not, address Christopher's other challenges to the denial of his habeas petition. Nor do we address whether the district court properly denied Christopher's Rule 60(b) motion.