[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 12, 2009
THOMAS K. KAHN
CLERK

No. 07-15427

D. C. Docket No. 06-00296-CR-ODE-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEREMIAH TRAVIS, III,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Georgia

**(February 12, 2009)**

Before BIRCH and PRYOR, Circuit Judges, and STROM,* District Judge.

STROM, District Judge:

---

* Honorable Lyle E. Strom, United States District Judge for the District of Nebraska, sitting by designation.

Jeremiah Travis, III appeals his 2,672 month[1] sentence for one count of armed bank robbery, 18 U.S.C. § 2113(a) and (d), eight counts of armed robbery, 18 U.S.C. § 1951, and nine counts of possession of a firearm in relation to a crime of violence, 18 U.S.C. § 924(c)(1)(A)(ii). Travis argues that the district court erred in admitting evidence obtained during a search of his residence consented to by his roommate, in allowing a witness to testify regarding statements made by others in violation of the Confrontation Clause, in admitting post-<u>Miranda</u> statements after he had invoked his right to silence, in imposing an unreasonable sentence, in applying the wrong Commerce Clause standard, and in misinterpreting the sentencing statute, 18 U.S.C. § 924(c). Upon review of the record we find no reversible error and affirm.

## I. BACKGROUND

On May 3, 2006, a Wachovia Bank in Tucker, Georgia, was robbed. The Federal Bureau of Investigation (FBI) released a surveillance photo of the bank robber to the media with an appeal for anyone with information to contact them. Eric Nelson Smith contacted the FBI to report that the bank robber looked like the man that had robbed him four days earlier at a Subway Restaurant. Smith reported that the Subway robber had taken his wallet and used his credit card to make a

---

[1] 222 years, eight months.

Western Union wire transfer. FBI agents obtained the wire transfer information from Western Union and discovered that the recipient of the funds was Andrea Bagley. Agents then went to the address listed for Ms. Bagley, located in an apartment complex called Complex 21. Two Complex 21 employees, while not knowing Andrea Bagley, identified the robber as likely being Angela Jones' boyfriend "Armani." Agents also discovered that Angela Jones was evicted from her apartment at Complex 21 on May 3, 2006, the same day as the bank robbery.

Having obtained Jones' work contact information from Complex 21, the agents approached her at her place of employment on June 5, 2006, where she waived her Miranda rights and agreed to be interviewed. Jones told the agents that she had participated in the Wachovia Bank robbery with Jeremiah Travis, and also admitted to participating in other robberies with him. At the agents' prompting, Jones placed a call to Travis to see if he would pick her up from work. However, the record is unclear regarding whether Travis had already left at the time of Jones' call. Travis appeared at Jones' place of employment, with Bagley's toddler son in the vehicle, where he was arrested without incident. Prior to Travis' arrival, Jones orally consented to the search of her apartment and vehicle, and signed written consent forms later that day.

When he was arrested, Travis invoked his <u>Miranda</u> rights. However, evidence was adduced at trial that while his fingerprints were being taken, and without being prompted, Travis said, "You got me. You got me. I did it. I did it." (R10:493-94.) Later that evening, as FBI Special Agents Whiteman and Johnson were escorting Travis into the Atlanta City Detention Center ("ACDC"), he stated that "the agents who arrested him earlier that day were lucky, and under different circumstances, things would have been much different." (R10:560.) Whiteman then asked Travis, "Do you mean if you had a gun, you would have shot it out with us?" (<u>Id.</u>) When Travis responded, "No doubt," Johnson asked him, "Even if -- even with the child in the back of the car, you would have shot it out with us?" (<u>Id.</u>) Travis answered, "Yes." (<u>Id.</u>)

The search of Jones' apartment, where Travis and Bagley also lived, commenced the same evening. The FBI found a loaded handgun, a shotgun, a dye stained jacket and shoes, a wallet, and a blue Old Navy tee-shirt. Later, Jones' car was searched, revealing a black pin-striped baseball cap and dye stained upholstery. These items were associated with several robberies.

Travis was ultimately charged with one count of bank robbery in violation of 18 U.S.C. § 2113, eight robberies in violation of the Hobbs Act, 18 U.S.C. § 1951, and using and carrying a firearm during and in relation to each of these nine

4

robberies in violation of 18 U.S.C. § 942(c). The case was tried to a jury which found Travis guilty on all counts. The district court later sentenced Travis to a term of 188 months imprisonment to run concurrently on the nine robberies, a sentence at the bottom of the applicable 188-235 month guideline range; a consecutive term of 84 months on the first violation of 18 U.S.C. § 924(c); and a consecutive term of 300 months for each of the succeeding eight violations of § 924(c) for a total sentence of 2,672 months imprisonment. Travis was also sentenced to five years supervised release, a special assessment of $1,800, and restitution.

## II. STANDARDS OF REVIEW

The interpretation of a statute is a question of law subject to <u>de novo</u> review. <u>United States v. Gray</u>, 260 F.3d 1267, 1271 (11th Cir. 2001). This Court reviews the sufficiency of the evidence <u>de novo</u> in the light most favorable to the government and determines whether a rational jury could have concluded beyond a reasonable doubt that the defendant was guilty of the crimes charged. <u>United States v. McCrimmon</u>, 362 F.3d 725, 728 (11th Cir. 2004). The district court's denial of the defendant's motions to suppress statements and evidence presents mixed questions of law and facts. This Court reviews the district court's factual findings for clear error, while the district court's application of the law to the facts

5

is reviewed de novo. United States v. Holloway, 290 F.3d 1331, 1334 (11th Cir. 2002). Evidentiary rulings are reviewed for a clear abuse of discretion. United States v. Ross, 131 F.3d 970, 987 (11th Cir. 1997). Questions of constitutional law are reviewed de novo. United States v. Underwood, 446 F.3d 1340, 1345 (11th Cir. 2006). The defendant's Confrontation Clause claim, if a violation is found, is also reviewed for harmless error. Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).

The Court normally reviews de novo questions of law such as the interpretation of 18 U.S.C. § 924 or issues arising under the United States Sentencing Guidelines. See, e.g., Gray, supra (Hobbs Act); United States v. Crawford, 407 F.3d 1174, 1178 (11th Cir. 2005) (sentencing guidelines). However, when the issue is presented for the first time on appeal, this Court will reverse only upon a showing of plain error. See United States v. Richardson, 166 F.3d 1360, 1361 (11th Cir. 1999) (interpreting 18 U.S.C. § 924); United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005) (interpreting guidelines). The defendant's sentence is subject to review for abuse of discretion in light of the factors set forth in 18 U.S.C. § 3553(a). Gall v. United States, 552 U.S. ___, 128 S. Ct. 586, 594 (2007). The review for reasonableness is deferential and "focuses on whether the sentence imposed fails to achieve the purposes of sentencing

enumerated in § 3553(a)." Id. The Supreme Court has held that an appellate court may afford a "presumption of reasonableness" to a within-Guidelines sentence consistent with both the Sixth Amendment and United States v. Booker, 543 U.S. 220 (2005). Nelson v. United States, 555 U.S. ___, No. 08-5657, slip op. at 2 (January 26, 2009) (per curiam) (citing Rita v. United States, 551 U.S. 338 (2007)).

## III. DISCUSSION

### A. Georgia v. Randolph

Travis argues that his Fourth Amendment rights were violated when agents searched his home based on Jones' consent. The Fourth Amendment protects "[t]he right of the prople to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ." U.S. Const. amend IV. "The warrantless search of a home is 'presumptively unreasonable.'" U.S. v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991). However, an established exception to the warrant requirement is a search that is conducted pursuant to consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Where co-tenants are present at the entrance, and one consents while the other objects, police may not search. Georgia v. Randolph, 547 U.S. 103, 121 (2006). However, the Supreme Court has drawn a fine line at the home's threshold. "[I]f a potential defendant

7

with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." Id. Here, neither Travis nor Jones was present at the threshold when the search began. Jones had consented orally and in writing while at her place of employment, and Travis was in custody when the agents arrived to conduct the search. Travis argues that the agents should have provided him with an opportunity to object to the search. However, nothing in Randolph suggests that the police must offer such an opportunity. To the contrary, the Randolph Court stated that "we think it would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received." Id. at 122.

Travis' argument is based on the Court's exception to its justification for the formalism of drawing a line at the search target's door. The Randolph Court recognized that requiring the potentially objecting co-tenant be physically present would undermine its core holding if police could simply arrest and remove the potentially objecting party from the threshold.

> This is the line we draw, and we think the formalism is justified. *So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection*, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it.

Id. at 121-22 (emphasis added). Travis points to the agents' request that Jones call him and ask that he pick her up and suggests that this is evidence of such a removal. However, at oral argument Travis' counsel allowed that there was no evidence that the agents removed him for the sake of avoiding a possible objection.[2] A review of the record confirms this. It is therefore irrelevant whether Travis left his residence before or after Jones called. For Randolph's possible exception to apply, there must be some evidence of police intent to avoid objection as well as of removal of the potentially objecting party from the entrance. Travis' Randolph argument fails.

B. Confrontation Clause

The Sixth Amendment provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

---

[2] "There is no smoking gun here. [The agents] did not say that they moved him away from the house in order to avoid him asking consent."

him." U.S. Const. amend VI. "Where testimonial evidence is at issue, . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 68 (2004). Statements are testimonial "when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Davis v. Washington, 547 U.S. 813, 822 (2006). Thus, "'[s]tatements taken by police officers in the course of interrogations are definitively testimonial' and . . . fall within the protection afforded by the Confrontation Clause. This includes not only 'technical legal' interrogations but also 'witness statements given to an investigating police officer.'" U.S. v. Arbolaez, 450 F.3d 1283, 1291 (11th Cir. 2006) (internal citations omitted).

In this case, the district court allowed Agent Whiteman to testify about what the two Complex 21 employees told him during his investigation. At Complex 21, Whiteman showed a surveillance photograph from the Wachovia Bank robbery to the two employees he interviewed. The first employee "stated that she recognized the robber to be Angela Jones' boyfriend, but she only knew him by the name of Armani." (R10:542.) The second employee said "that she was 85 percent sure that the individual depicted in that photograph was Angela Jones' boyfriend. She

10

only knew him as well as [sic] the name of Armani." (R10:548.)  There was no ongoing emergency at the time these statements were taken.  Indeed, the obvious purpose of Whiteman's interrogation -- as it should be -- was to prove past events relevant to a criminal prosecution.  Thus, the statements were testimonial.  Moreover, the government did not assert that the Complex 21 employees were unavailable as witnesses, and it is undisputed that they were never cross-examined.

The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  Crawford, 541 U.S. at 59 n.9.  The government argues that Whiteman's recitation of the Complex 21 employees' statements "was offered to show the investigative steps that the FBI took to identify and locate the persons who committed the armed robbery of Wachovia Bank."  However, the government's interpretation, if adopted, would eviscerate Crawford.  Indeed, it is difficult to conceive of a circumstance where a testimonial statement could not be recast as merely showing the steps the police took during their investigations.  We therefore reject the government's argument and hold that the district court erred in allowing Whiteman to testify about what the Complex 21 witnesses said.  The error, however, was harmless.

11

Confrontation Clause errors are subject to harmless error analysis.

Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Id. In this case, if the testimony of the Complex 21 employees as relayed by Whiteman had been thoroughly impeached and discredited, the result of the proceeding would not have been different. Although the testimony Whiteman gave referred to the identification of Travis as the robber,[3] this testimony was not important to the prosecution's case. The testimony was cumulative, since both Jones and Bagley identified Travis as the robber. Jones and Bagley also corroborated all the material points of the testimony, and no witness testified in contradiction. Cross examination was permitted and had with respect to every

_____

[3] The government would have us find that an identification of the Wachovia Bank robber as "Armani" and as Jones' roommate does not amount to an identification of Travis. We find no merit in this argument.

other witness at trial. Moreover, the physical evidence of Travis' guilt was massive: Firearms and clothing associated with the robberies -- some stained with dye -- were found in Travis' residence; the upholstery in Jones' car was stained with dye; and Travis' fingerprint was found at the bank. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967). In light of the evidence adduced at trial, the district court's error in allowing Whiteman to testify about what the Complex 21 employees told him was harmless beyond a reasonable doubt.

C. Miranda v. Arizona

The district court did not err in admitting evidence of Travis' statements at the ACDC. Travis argues that the agents violated Miranda v. Arizona, 384 U.S. 436 (1966), when they asked him if he would have shot it out with the police. We have held that once the right to silence is invoked, police must "scrupulously honor" it and are forbidden from further interrogation. See, e.g., Jacobs v. Singletary, 952 F.2d 1282, 1292 (11th Cir. 1992). The government argues that these questions by the agents were not interrogation within the meaning of Miranda and its progeny. However, it is unnecessary for us to reach the question because Travis waived his Miranda rights.

13

Where, as here, a "conversation is not 'wholly one-sided,' but instead involves interrogation by the police, the suspect's statements are admissible only if the suspect both initiated the dialogue and waived his previously-asserted right to silence." Christopher v. State of Fla., 824 F.2d 836, 844 (11th Cir. 1987). Law enforcement officers may ask routine booking questions, even when a defendant has invoked his right to remain silent. United States v. Sweeting, 933 F.2d 962, 965 (11th Cir. 1991). Travis argues that the agents initiated the dialogue when they asked if he had been to ACDC before, while the government argues that Travis initiated the conversation when he said the earlier agents had been lucky. When an inquiry is "so routine . . . that [it] cannot be fairly said to represent a desire . . . to open up a more generalized discussion relating directly or indirectly to the investigation . . . [the inquiry] will not generally 'initiate' a conversation . . . ." Oregon v. Bradshaw, 462 U.S. 1039, 1045 (1983). Here, the agents' first question -- whether or not Travis had been to the ACDC before -- falls within that category. "'Initiation' means to 'begin' or 'set-going'; in the interrogation context, it means that the suspect 'started,' not simply 'continued,' the interrogation." Christopher, 824 F.2d at 845. It was Travis, not the FBI agents, who started the discussion about the arresting agents' luckiness. Travis was well aware of his rights at the time he made the statements, having already invoked

14

them.  Moreover, there is no evidence that the agents made any threats or promises to him.  Finally, evidence admitted in violation of <u>Miranda</u> is subject to harmless error analysis.  <u>United States v. Street</u>, 472 F.3d 1298, 1314-15 (11th Cir. 2006).  As discussed above, the evidence of guilt adduced at Travis' trial was massive.  Even if there had been a <u>Miranda</u> violation here, and we hold that there was not, excluding this statement would not have changed the result in this case.  Because there was no <u>Miranda</u> violation and because any theoretical error was harmless beyond a reasonable doubt, this argument lacks merit.

D. Reasonableness of sentencing

Travis argues that his sentence is procedurally unreasonable because the district court erred in failing to calculate the sentencing guidelines range on the record.  Here, the district court implicitly adopted the guidelines range detailed in the presentence investigation report at sentencing, and Travis failed to object to the district court's failure to do so explicitly, although he was provided with an opportunity to do so.  Although the district court also did not specifically mention any of the § 3553(a) factors, it did overrule defense counsel's objections to the guideline enhancements, and permitted defense counsel to argue for leniency based on Travis' mental illness and the government to request a guideline sentence based on the nature and circumstances of the offense.  Some indication in the

15

record that the court adequately and properly considered the applicable advisory guideline range and the § 3553(a) factors is all that is required. See Gall v. United States, 552 U.S. ___, 128 S.Ct. 586, 597 (2007); United States v. Scott, 426 F.3d 1324, 1329 (11th Cir. 2005) ("[N]othing in Booker or elsewhere requires the district court to state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553(a) factors."). We therefore conclude that Travis' sentence was procedurally reasonable.

Having determined that Travis' sentence is procedurally reasonable, we next review for substantive reasonableness in light of the 18 U.S.C. § 3553(a) factors. See United States v. Martin, 455 F.3d 1227, 1237 (11th Cir. 2006). Although appellate courts may apply a presumption of reasonableness to sentences within the applicable sentencing guideline, see Rita v. United States, 551 U.S. ___, 127 S.Ct. 2456, 2462-63 (2007), this circuit does not make such a presumption. United States v. Campbell, 491 F.3d 1306, 1313 (11th Cir. 2007). Here, regardless of whether review for reasonableness focuses only on the 188 month portion of Travis' sentence or also considers the portion of his total sentence managed by the guidelines in relation to the statutorily-mandated components, the district court did not abuse its discretion by imposing a sentence at the bottom of the applicable guideline range. Although the district court did not so expressly

16

state, the record shows that it agreed with the government that a guideline sentence was warranted to address the nature and circumstances of the offense and the seriousness of the offense, considering the district court's comment that a guideline sentence was necessary to ensure that Travis remained incarcerated in the event the mandatory minimums were someday decreased. See 18 U.S.C. § 3553(a)(1), (2). The district court also recommended that Travis receive mental health care while incarcerated, thereby taking into account the need to provide him with medical care or other correctional treatment in the most effective manner. See id. at (a)(2)(D). Accordingly, Travis' guideline sentence was substantively reasonable.

E. Remaining issues

Mr. Travis also argues that the Hobbs Act can only be constitutional if the government shows a substantial, rather than a minimal, effect on interstate commerce. It is well settled in this circuit that a minimal effect on commerce is sufficient. See, e.g., United States v. Gray, 260 F.3d 1267, 1272 (2001). A review of the record reveals sufficient evidence to support the jury's finding of a minimal effect on commerce with respect to each of the robbery counts.

Similarly, Travis argues that the phrase "second or subsequent conviction under this subsection" in 18 U.S.C. 924(c)(1)(A)(ii), (C)(i), applies only if the

17

second or subsequent violation occurs after a prior Section 924(c) conviction and sentence. As counsel notes, this argument was rejected by the Supreme Court of the United States in <u>Deal v. United States</u>, 508 U.S. 129, 137 (1993), and by this circuit in <u>United States v. Rawlings</u>, 821 F.2d 1543, 1547 (11th Cir. 1987). We decline to revisit the issue today.

## IV. CONCLUSION

Upon review of the record and finding no reversible error, we affirm.

AFFIRMED.